## DE SAUSSURE *v.* GAILLARD.

ERROR TO THE SUPREME COURT OF THE STATE OF SOUTH CAROLINA.

No. 205. Argued and Submitted April 4, 1888. — Decided April 30, 1888.

It appearing that, before reaching and deciding the federal question discussed here, the Supreme Court of South Carolina had already decided that the plaintiff's action could not be sustained according to the meaning of the provisions of the statute of that State under which it was brought, this court dismisses the writ of error for want of jurisdiction, under the well settled rule that, to give this court jurisdiction of a writ of error to a state court it must appear affirmatively not only that a federal question was presented for decision to the highest court of the State having jurisdiction, but that its decision was necessary to the determination of the cause, and that it was actually decided, or that the judgment as rendered could not have been given without deciding it.

When a State grants a right of remedy against itself, or against its officers in a case in which the proceeding is in fact against the State, it may attach whatever limitations and conditions it chooses to the remedy; and its own interpretation and application of its statutes on that subject, given by its own judicial tribunals, are conclusive upon the parties seeking the benefits of them.

THE court stated the case as follows:

The complaint in this case filed in the Court of Common Pleas in the County of Charleston, South Carolina, alleged

that the plaintiff was the owner and holder of three bonds of the State of South Carolina, two designated by the numbers 850 and 851, for $500 each, and one by the number 2290, for $1000; that thereby the State of South Carolina promised to pay to the bearers the sums therein named on the 1st day of July, 1893, with interest at the rate of six per cent per annum payable semi-annually, on the 1st day of January and July of each year, on the presentation of the proper coupons thereto annexed bearing the signature of the State Treasurer, said coupons being receivable in payment of all taxes due the State during the year in which they mature, except for the tax levied for the public schools, the words following being indorsed on each of the said bonds, viz.: "The payment of the interest and the redemption of the principal of this bond is secured by the levy of an annual tax of two mills upon the entire taxable property of the State. The faith, credit, and funds of the State are hereby solemnly pledged for the punctual payment of the interest and redemption of the principal of this bond by the act of the General Assembly approved December 22d, 1873;" and upon each of said coupons was indorsed the following: "State of South Carolina. Receivable in payment of all taxes except school tax;" that the plaintiff became the holder for value of the three bonds mentioned in the year 1878, and of all the coupons thereto annexed, including the coupon which matured on each, respectively, on the 1st day of January, 1882; that notwithstanding the contract of the State expressed in the act of December 22, 1873, recited in said consolidation bonds, the General Assembly of South Carolina, by an act entitled "An act to raise supplies and make appropriations for the fiscal year commencing November 1st, 1881," approved February 9, 1882, has prohibited the county treasurers of the State from receiving the coupons of said bonds in payment of the taxes levied by the said act, which last mentioned act the plaintiff charges to be void as repugnant to article 1, section 10, of the Constitution of the United States, forbidding the States to pass any law impairing the obligation of contracts.

The complaint further alleges that the defendant is the

county treasurer for Charleston County, whose duty it is to collect and receive the taxes due to the State of South Carolina upon the property situate in that county; that the plaintiff is the owner of property in said county upon which taxes were levied under the provisions of the act to raise supplies for the fiscal year commencing November 1, 1881, in the sum of $153.86, of which sum $29.34 were levied by the said act for the public schools; that on the 18th day of December, 1882, the plaintiff tendered to the defendant, as county treasurer, in payment of said taxes, $131.97 in cash, and the remainder, viz., $60, in the coupons of the said consolidated bonds Nos. 850, 851 and 2290, which matured on the 1st day of January, 1882; that the defendant wrongfully and illegally refused to receive the said coupons, and assigned as a reason therefor that he was forbidden so to do by the provisions of the said act; whereupon the plaintiff paid to the defendant, under protest, the sum of $191.97 in legal tender notes of the United States, in pursuance of the provisions of an act of the General Assembly of said State, approved the 24th of December, 1878, entitled "An act to facilitate the collection of taxes."

Plaintiff therefore demands judgment "that it be adjudged that the amount of sixty dollars in United States currency paid by the plaintiff to the defendant on the eighteenth day of December, 1882, was wrongfully and illegally collected and ought to be refunded, and that a certificate of record thereof be issued accordingly to the plaintiff; that he have such further relief in the premises as the nature of the case may require and to the court may seem meet and proper."

The answer of the defendant set forth the history of the legislation of the State of South Carolina on the subject subsequent to the passage of the act of December 22, 1873, known as the consolidation act as follows:

"II. Defendant, further answering, alleges that subsequent to the passage of said act the General Assembly of the said State, by a 'Joint resolution to raise a commission to investigate the indebtedness of the State,' approved June 8, 1877, provided a commission to make a complete and thorough investigation of

the entire amount of consolidated bonds and certificates of
stock which had been issued under the 'consolidation act'
aforesaid, and of the bonds, coupons, and certificates of stock
which had been surrendered to the state treasurer in exchange
for the consolidated bonds and certificates of stock issued
under said act, and to report to the General Assembly any
illegality or non-conformity to law in the issue of consoli-
dated bonds and certificates of stock, and the grounds of the
same, which commission is known as the 'bond commission.'

"That the said commission made a report to the General
Assembly of the result of the investigation made by them
under the joint resolution aforesaid, with schedules annexed
showing the different classes of bonds and certificates of stock
which had been surrendered in exchange for consolidated bonds
and certificates of stock, Schedule 6 showing the consolidated
bonds and certificates of stock which, in the judgment of the
said commission, were not issued in accordance with law and
were not authorized to be consolidated under the 'consolida-
tion act.'

"And thereupon the General Assembly, by a 'Joint resolu-
tion providing a mode of ascertaining the debt of the State
and of liquidating the same,' approved March 22, 1878, created
a special court, known as the 'court of claims,' to hear and
determine any case or cases made up or brought to test the
validity of any of the consolidated bonds or certificates of
stock or of any of the various classes of bonds or certificates
of stock mentioned in the said report of the 'bond commission'
as not issued in accordance with law.

"It was further-provided by the joint resolution aforesaid
that there should be the same right of appeal from the said
'court of claims' to the Supreme Court of South Carolina as
from the Circuit Courts of the said State, and with a right of
appeal by writ of error or otherwise as provided by law to
the Supreme Court of the United States.

"That said special court should have the same right to enter
judgment, issue execution, punish for contempt, and enforce its
mandates as was then possessed by the Circuit Courts of the
State of South Carolina.

" That the State should be represented in said special court by the attorney general and two associate counsel to be selected by the joint vote of the General Assembly.

" That the attorney general and his associates, with the consent of the creditors of the State, or so many of them as shall be necessary, might make up a case or cases to be heard and determined in said court, in which, if practicable, the State should be the defendant, to test the validity of the said consolidated bonds, coupons, and certificates of stock mentioned in Schedule 6 of the report of the ' bond commission,' bringing before the court the various classes of vouchers which it is stated in the said report impair the validity of the said consolidated bonds, coupons, or certificates of stock or any of them.

" The said joint resolution further provided for the levy for the current year of a tax sufficient to pay the coupons and interest orders maturing on the outstanding consolidated bonds and certificates of stock during the said fiscal year, the interest on the consolidated bonds and certificates of stock mentioned in Schedule 5 of the report of the ' bond commission' as subject to no valid objection to be paid, and the payment of the interest on the several classes of consolidated bonds and certificates of stock mentioned in Schedule 6 of said report whenever there should be a final adjudication as to the validity of the several classes of bonds and stocks in the manner therein provided, and none other.

" That in pursuance of the provisions of the said joint resolution, actions in which the State of South Carolina was the defendant were, with the consent of the attorney general and his associates, brought in the said ' court of claims' on coupons of the bonds of the various classes mentioned in Schedule 6 of the report of the ' bond commission.'

" That after trial and hearing of the said causes, the said ' court of claims' rendered judgment in favor of the State.

" From the judgments of the ' court of claims,' in these several cases, appeals were taken to the Supreme Court of the State of South Carolina, as provided in the joint resolution establishing the said ' court of claims.'

" That upon the hearing of the said appeals the Supreme Court of the State of South Carolina, at the April term, 1879, in the cases entitled ' *G. M. Walker, Cashier, Appellant* v. *The State of South Carolina, Respondent,*' and ' *F. J. Pelzer, Appellant* v. *The State of South Carolina, Respondent,*' decreed and adjudged :

" First. That all the bonds issued under the ' consolidation act ' are valid obligations of the State of South Carolina, except as follows :

" 1st. Such as were issued in exchange for bonds issued under the act entitled ' An act to authorize a loan for the relief of the treasury,' approved February 17, 1869, or for the coupons of such bonds, the said act being repugnant to § 7, article IX, of the constitution of the State of South Carolina, in that it purports to create a debt which was not ' for the purpose of defraying extraordinary expenditures,' and the debt sought to be created not being ' for some single object,' and such object not being ' distinctly specified therein,' as required by the said section and article of the constitution.

" 2d. Such as were issued in exchange for the second issue of bonds under an act entitled ' An act to authorize a state loan to pay interest on the public debt,' and which were indorsed ' issued under act approved August 26, 1868,' or the coupons of such bonds, the said bonds and coupons being absolutely void, even in the hands of *bona fide* holders, because issued without any authority whatever.

" 3d. Such as were issued in exchange for those conversion bonds which were issued in exchange for either of the bonds or coupons of the two classes mentioned:

" Second. That if any consolidated bond rests wholly upon any of the three objectionable classes of bonds therein mentioned, then it is wholly void ; but if it rests only in part upon such objectionable bonds and coupons, then it is void only to the extent which it does rest upon such objectionable bonds or coupons, and for the balance it is a valid obligation of the State.

" Third. That the burden of proof is upon the State to show that any particular bond which may be brought into

question does rest either in whole or in part upon such objectionable bonds and coupons, and if in part only. then the State must show what part is so affected.

" III. Defendant further alleges that by an act entitled ' An act to provide for the settlement of the consolidated debt of the State in accordance with the decision of the Supreme Court of the State of South Carolina,' approved December 23, 1879, after reciting the legislation and the decision of the Supreme Court of the State of South Carolina in relation to the consolidated debt of the State hereinbefore set forth, and that it is to the interest of the State and her creditors that the principles established in the said decision of the Supreme Court should be accepted as final and forthwith applied in the elimination from the consolidated debt of the State of all invalid material, a special commissioner was appointed to ascertain and establish the exact percentage and amount of the invalidity of each and every consolidated bond and certificate of stock of the state consolidated debt and of the interest thereon in accordance with the principles laid down in the said decision of the Supreme Court of the State.

" And it was therein further provided that the said special commissioner should, at least once in each month during the period of said ascertainment, make a detailed report to the state treasurer, setting forth therein by their numbers the consolidated bonds, coupons, certificates of stock, and interest orders investigated by him during the previous month; also whether the same, under the decision of the Supreme Court aforesaid, be wholly valid or only partially valid, and where only partially valid in each case he should also set forth the exact percentage, amount, and character of the invalidity; that he should continue to make such detailed reports to the state treasurer until he should have investigated and reported upon the entire consolidated debt of the State.

" It was further therein provided that every holder of any consolidated bond or certificate of stock, or of the interest thereon reported by said special commissioner as partially invalid, shall have the right to surrender to the state treasurer for cancellation such bonds, certificates of stock, and interest;

and upon such surrender and cancellation he shall be entitled to receive from the state treasurer, who is authorized and required to issue the same, a new bond or certificate of stock equal in amount to the exact amount of the valid portion of such bond, certificate of stock, coupon, or interest order ; such new bonds and certificates of stock to be in all respects similar and of like validity to and having the same benefits and privileges as those provided for in the ' consolidation act,' approved 22d December, 1873; saving and except that the first coupon or interest to mature thereon shall mature on the 1st of January, 1879, and the same rights and privileges are likewise given to the holders of detached coupons and interest orders.

" And it was further thereby declared ' that the bonds and stocks reported by the special commissioner as valid, and the portions of the bonds and stocks also reported by him as valid, but exchanged by their holders, as hereinbefore provided, for new consolidated bonds or stocks, are hereby declared to be valid and unquestioned obligations of the State.' (And the bonds and stocks so declared to be unquestionable obligations of the State are designated and known as ' brown consols.')

" That the special commissioner appointed under the act aforesaid did perform the duties required of him by said act, and did make to the state treasurer from time to time the report of his investigations until he had investigated and reported upon the entire consolidated debt of the State, as required by the said act, which reports of the said special commissioner remain in the office of the state treasurer.

" That by an act entitled ' An act to extend the time for funding the unquestionable debt of the State,' approved December 24, 1880, the comptroller general of the State is required to examine into the character and material of all consolidated bonds and certificates of stock of the State issued since the first day of January, 1866, together with the coupons and interest orders thereon, which may be presented to him for this purpose by the holders thereof, and to report to the state treasurer how the said bonds, certificates of stock, coupons, and interest orders are affected by the decision

of the Supreme Court of the State hereinbefore stated and the exact percentage of invalidity in the material reported upon as established by the said decision.

"And the state treasurer is authorized and required, in lieu of the bonds, stocks, coupons, and interest orders so surrendered, to issue consolidated bonds and certificates of stock for fifty per cent of the face value of the valid material surrendered.

"That the State has since provided for the levy of an annual tax upon the taxable property of the State and for the payment by the state treasurer, from the proceeds of said tax, of the interest on the entire consolidated debt of the State, ascertained and reported by the special commissioner aforesaid to be valid, in accordance with the decision of the Supreme Court aforesaid, and also upon such portions of the same as shall have been ascertained and reported by said special commissioner to be valid and justly due by the State as the same shall appear from the certificates of the said special commissioner filed in the office of the state treasurer.

"That by joint resolution approved 9th February, 1882, it was resolved as follows:

"Whereas the consol bonds bear upon their face the contract of the State to receive the coupons of the same for taxes; and

"Whereas, from the fact that the green consols outstanding are more or less tainted with invalidity, varying with each security (which has been established by the courts and acquiesced in by the holder), the coupons from this class of bonds cannot be received by the tax collector, but can only be paid at the state treasury where access to the registry permits the amount of invalidity in each coupon to be ascertained: Now, therefore, in order to hasten the process now going on of the conversion of green consols into brown consols, which latter represent the unquestioned consol debt of the State, and the coupons from which are now being received in payment for taxes:

"Be it resolved, That on and after the first day of January, eighteen hundred and eighty-three, the interest upon the

green consol bonds and stocks of the State shall not be paid at the treasury until said securities have been converted into brown consol bonds and stocks."

The answer then proceeded to set forth the particulars in which it was claimed that the consolidated bonds described in the complaint are not valid obligations of the State of South Carolina, and further alleged "that the holders of the bonds Nos. 850, 851 and 2290 mentioned in the complaint did not bring the same before the special 'court of claims,' and that they have never surrendered the same to the commissioner or the comptroller general or the state treasurer to ascertain and establish the exact percentage and amount of the invalidity of the said bonds in accordance with the principles laid down in the decision of the Supreme Court of the State of South Carolina aforesaid, as provided by law, and have never received new consolidated bonds or certificates of stock equal in amount to the valid portions of said bonds, as provided by law, known as 'brown consols.'"

The answer further alleged that the act entitled "An act to raise supplies and make appropriations for the fiscal year commencing November 1, 1881," approved February 9, 1882, "provides that all taxes assessed and payable under the said act shall be paid in the following kinds of funds and no other: Gold and silver coin, United States currency, national bank notes, and coupons which shall become payable during the year 1882 on the valid consolidated bonds of the State known as 'brown consols:' Provided, however, the jury certificates and the *per diem* of state witnesses in the circuit courts shall be received for county taxes, not including school taxes;" and the defendant admitted and justified under the terms of said act his refusal, as county treasurer of Charleston County, to receive the coupons tendered by the plaintiff in payment of taxes.

The cause came on for trial before a jury, who, under the instructions of the court to that effect, found a verdict for the defendant, on which judgment was accordingly rendered. On appeal to the Supreme Court of the State this judgment was affirmed. To review that judgment the present writ of error has been sued out.

*Mr. Clarence A. Seward, Mr. Samuel Lord* and *Mr. T. M. Mordecai* for plaintiff in error, submitted on their brief.

*Mr. Joseph H. Earle,* Attorney General of South Carolina, for defendant in error.

MR. JUSTICE MATTHEWS, after stating the case, delivered the opinion of the court.

This action is not brought against the defendant in his individual capacity for a trespass or wrong alleged to have been committed by him as a natural person upon the property or personal rights of the plaintiff; it is brought against him in his official capacity as Treasurer of the County of Charleston, to recover judgment for a sum of money voluntarily paid by the plaintiff, though under protest, demanded and received by the defendant in his official capacity, contrary, as the plaintiff alleges, to law. The judgment sought is not a personal judgment against the defendant, but for a judicial declaration that the money paid was wrongfully and illegally collected, and ought to be refunded in order that a certificate of record thereof may be issued accordingly, to the end that the amount might be repaid out of the state treasury.

The action is founded expressly on the provisions of the act of the General Assembly of the State of South Carolina, approved December 24, 1878, entitled "An act to facilitate the collection of taxes." The first section of that act provides: "That in all cases in which any state, county, or other taxes are now or shall hereafter be charged upon the books of any county treasurer of the State against any person, and such treasurer shall claim the payment of the taxes so charged, or shall take any step or proceeding to collect the same, the person against whom such taxes are charged or against whom such step or proceeding shall be taken shall, if he conceives the same to be unjust or illegal for any cause, pay the said taxes notwithstanding, under protest, in such funds and moneys as the said county treasurer shall be authorized to receive by the act of the General Assembly levying the same, and

upon such payment being made the said county treasurer shall pay the taxes so collected into the state treasury, giving notice at the time to the comptroller general that the payment was made under protest, and the person so paying said taxes may at any time within thirty days after making such payment, but not afterwards, bring an action against the said county treasurer for the recovery thereof in the Court of Common Pleas for the county in which such taxes are payable; and if it be determined in said action that such taxes were wrongfully or illegally collected, for any reason going to the merits, then the court before whom the case is tried shall certify of record that the same were wrongfully collected and ought to be refunded, and thereupon the comptroller general shall issue his warrant for the refunding of the taxes so paid, which shall be paid in preference to other claims against the treasury : *Provided,* That the county treasurers shall be required to receive jury and witness tickets for attendance upon the circuit courts of the State receivable for taxes due the county in which the said services are rendered."

The second section of the act prohibits any other remedy " in any case of the illegal or wrongful collection of taxes or attempt to collect taxes, or attempt to collect taxes in funds or moneys which the county treasurer shall be authorized to receive under the act of the General Assembly levying the same, being other than such as the person charged with said taxes may tender or claim the right to pay, than that provided in § 1 of this act." It expressly provides that "no writ of mandamus shall be granted or issued from any court, or by the judge of any court, directing or compelling the reception for taxes of any funds, currency, or bank bills not authorized to be received for such taxes by the act of the General Assembly levying the same ; " and directs that " no writ, order, or process of any kind whatsoever, staying or preventing any officer of the State charged with a duty in the collection of taxes from taking any step or proceeding in the collection of any tax, whether such tax is legally due or not, shall in any case be granted by any court, or the judge of any court, but in all cases whatsoever the person against whom any taxes shall

stand charged upon the books of the county treasurer shall be required to pay the same in such funds and moneys as the said county treasurer shall be authorized to receive by the act of the General Assembly levying the said taxes, in manner and form as above provided, and thereupon shall have his remedy under the provisions of the first section of this act, and in no other manner."

The third section of the act is as follows: "That in all cases in which any person against whom any taxes stand charged upon the books of any county treasurer of the State has heretofore tendered in payment of the same any funds, currency, or bank bills, other than such as the said treasurer was authorized to receive by the act of the General Assembly levying said taxes, the said treasurer shall receive from such person the said taxes without penalty in funds or moneys authorized to be received by the act of the General Assembly levying the same: *Provided*, That such taxes shall be so paid within sixty days from the passage of this act; and any person so paying the same may do so under protest, and thereupon shall be entitled to all the benefits of the remedy provided in § 1 of this act."

The Supreme Court of South Carolina, in rendering the judgment now under review, 21 South Carolina, 560, referred in its opinion to the legislation of the State on the subject of its bonded indebtedness, an abstract of which is given in the pleadings, beginning with the joint resolution adopted June 8, 1877, and declared (p. 567), that it "was manifestly designed to ascertain *judicially*, by the rules and principles of law which regulate contracts between individuals, what was the valid debt of the State, and to make ample provision for the prompt and punctual payment of the interest on the debt so ascertained." After tracing the history of this legislation, and of the judicial and other proceedings taken thereunder, the opinion of the Supreme Court of South Carolina proceeds as follows (p. 568):

"In pursuance of these provisions, a very large amount of the original consolidation bonds, which were colored green and are usually designated as green bonds or 'green consols,'

were exchanged for the new consolidation bonds, colored brown, and are usually designated as 'brown bonds' or 'brown consols,' and represent the valid, unquestioned debt of the State, the coupons on which are received for taxes or are promptly paid on presentation. But as it was impossible to tell whether a 'green bond' represented in whole or in part, and, if so, what part, any portion of the valid debt of the State without an examination of the records of the office of the treasurer of the State, where the various reports of the special commissioner above mentioned were filed, the various county treasurers of the State are not allowed to receive the coupons of the 'green bonds' in payment of taxes until they have been examined and any invalidity which they may contain eliminated and the valid portion converted into 'brown bonds.'

"It seems, therefore, that the scope and effect of this legislation was not to impair the obligation of any contract entered into by the State with its bondholders, whereby the State had agreed to receive the coupons of certain bonds in payment of taxes, but was simply to provide a mode of proceeding by which it could be definitely and easily ascertained whether a coupon offered in payment of taxes represented any portion of the valid debt of the State; for, unless it did, there certainly was no contract on the part of the State that it should be received in payment of taxes. . . . It certainly cannot be pretended that because a tax-payer tenders in payment of his taxes a coupon of a bond purporting to be a consolidation bond of the State, colored green, that the State and its fiscal officers are bound to receive it without question as to whether it is valid or invalid; and as the State cannot be sued except with its own consent, and then only in the mode which it permits, it follows necessarily that the only mode by which the validity of the coupon so offered in payment of taxes can be tested is that which has been prescribed by the State."

In answer to the objection that the present plaintiff was not a party to any of the actions instituted in the court of claims to test the validity of his bonds, and that he is not bound by any adjudication therein, the opinion says: "This

position might possibly be very well maintained if the defence here was based simply on the doctrine of *res adjudicata;* but that is not the ground upon which the defence rests. The true ground is, that, as the State could not be sued except with its own consent, and then only in the mode which it had seen fit to prescribe, and as the State did prescribe a mode by which it could be sued, and the validity of its debt tested upon the same principle by which the contracts of individuals are tested, and having invited all persons having claims against it, whose claims were disputed, to come in and assert and establish their claims, one who has failed to avail himself of the opportunity thus offered cannot afterward, in another proceeding not permitted by the State, maintain an action against the State or against any of its officers for refusing to do that which the laws of the State forbid."

The Supreme Court of South Carolina then proceeds to examine the contention on the part of the plaintiff, that the act of the 24th of December, 1878, entitled "An act to facilitate the collection of taxes," 16 Stats. South Carolina, 785, expressly authorizes an action against the county treasurer when such coupons as his have been tendered for taxes and refused. Upon that point its opinion is expressed as follows (p. 570):

"This position is, we think, based upon a total misconception of the true meaning of that act. It certainly never was designed to afford an opportunity to a bondholder to reopen the question as to the validity of any portion of the state debt, which it was supposed had been determined by the decision of this court in the ' *Bond Debt Cases,*' from which no intimation of appeal had been given. The very object of the legislation of the State hereinbefore considered was, as we have seen, to obtain a final determination of the question of the validity of the state debt ; and certainly the legislature, by an act passed nearly a year before such *final* determination was reached, never intended to afford the means of reopening any of the questions thus finally determined. In addition to this, the phraseology of the act shows that it was never designed to afford a remedy to the bondholder in case his

coupons were refused when tendered for taxes, but was intended solely to afford a remedy in case bills of the bank of the State were refused when tendered for taxes. But even if it should be conceded that the terms of the act to facilitate the collection of taxes were broad enough to cover a case in which coupons of bonds purporting to be bonds of the State are refused when tendered for taxes, as well as a case in which taxes are tendered and refused in other 'funds and moneys' than the collecting officers are authorized by the act levying such taxes to receive, we do not see how these actions can be maintained. By the express terms of the act it must be made to appear that the county treasurer has *illegally* and *wrongfully* refused to receive payment of the taxes assessed against the plaintiff in anything else but gold and silver coin, United States currency, national bank notes, and coupons which shall become payable during the year 1882 on the valid consolidation bonds of this State, known as 'brown bonds,' as required to do by the 7th section of the 'Act to raise supplies and make appropriations for the fiscal year commencing November 1, 1881,' approved February 9, 1882, 17 Stats. South Carolina, 1070. Practically this last mentioned act forbids county treasurers from receiving in payment of taxes any coupons of bonds which have not been ascertained in the manner prescribed by the legislation hereinbefore mentioned to be valid obligations of the State. Now, if, as we have seen, the State had the right to prescribe the mode by which the validity of any bond purporting to be an obligation of the State should be tested and determined, and if, as we have also seen, such mode was prescribed, and the validity of all the various classes of bonds purporting to be obligations of the State was passed upon and finally determined, it would seem to follow necessarily that the State had a perfect right to forbid its officers charged with the collection of its revenue from receiving in payment of taxes any coupons or other form of obligation which had not only not been adjudged to be a valid obligation of the State, but which, on the contrary, had been expressly adjudged to be invalid. There certainly can be nothing illegal or wrongful in an officer of the State

yielding obedience to a law of the State passed in the usual form, in pursuance of a judgment of its highest judicial tribunal, from which there had been no appeal to the tribunal of last resort, though express provision had been made for such appeal."

After having thus decided that the present action was not maintainable under the provisions of the act of December 24, 1878, the Supreme Court of South Carolina proceeds to review the grounds of its prior decisions in the *Bond Debt Cases*, 12 South Carolina, 200, 263, 294, and restates and reaffirms the same, going at large into the question of the validity of the bonds held by the plaintiff as obligations of the State, adjudging them to be invalid. The conclusion follows and is declared that the act of the General Assembly entitled " An act to raise supplies and make appropriations for the fiscal year commencing November 1, 1881," approved February 9, 1882, alleged by the plaintiff to be void as impairing the obligation of the State contained in the bonds and coupons, is a valid and constitutional law, and justified the defendant, as county treasurer, in refusing to receive the coupons in payment of taxes when tendered.

It thus appears that in point of fact the Supreme Court of the State of South Carolina in its opinion in this case passed upon the federal question sought to be raised by the plaintiff as the foundation of his case, and decided it adversely to him; but the analysis of the case which we have made shows clearly that the decision of that question was not necessary to the judgment. Before reaching that question, the Supreme Court had already decided that the action of the plaintiff could not be sustained, according to the meaning of the provisions of the statute under which it was brought. The decision of that point was final, and was fatal to the plaintiff's right of recovery. That question is not a federal question; it does not arise under the Constitution of the United States, or of any law or treaty made in pursuance thereof. It is not a question, therefore, which, under this writ of error, we have a right to review. We are not authorized to inquire into the grounds and reasons upon which the Supreme Court proceeded in its construction

of that statute. It is a state statute conferring certain rights upon suitors choosing to avail themselves of its provisions upon certain conditions in certain cases. Who may sue under it, and when, and under what circumstances, are questions for the exclusive determination of the state tribunals, whose judgment thereon is not subject to review by this court. It was competent for the State of South Carolina either to grant or withhold the right to bring suits against the officers of the State for the recovery of money alleged to have been illegally exacted and wrongfully paid. If granted, the action is in substance, though not in name, an action against the State itself, just as an action permitted by the acts of Congress on the subject against a collector of customs, for the recovery of duties alleged to have been illegally exacted, and paid under protest, is an action against the United States, though nominally against the collector. In such cases, as the State may withhold all remedy, it may attach to the remedy it actually gives whatever conditions and limitations it chooses; and its own interpretation and application of its statutes on that subject, given by its own judicial tribunals, are conclusive upon the parties seeking the benefit of them. No right secured by the Constitution of the United States to any citizen is affected by them unless they are framed or administered so as, in some particular case, to deprive the party of his property without due process of law, or to deprive him of the equal protection of the laws. No such question is or can be made in reference to the statute of South Carolina under consideration. It authorizes, in certain enumerated cases, parties found to be within its terms to bring a prescribed action against the State in the name of one of its officers. According to the decision of its highest tribunal, the plaintiff in this action is not within the class entitled to sue. To review that judgment is not within the province of this court, because it does not deny or injuriously affect any right claimed by the plaintiff under the Constitution or laws of the United States.

It is a well-settled rule, limiting the jurisdiction of this court in such cases, that " where it appears by the record that the judgment of the state court might have been based either

upon a law which would raise a question of repugnancy to the Constitution, laws, or treaties of the United States, or upon some other independent ground; and it appears that the court did, in fact, base its judgment on such independent ground, and not on the law raising the federal question, this court will not take jurisdiction of the case, even though it might think the position of the state court an unsound one." *Klinger* v. *Missouri*, 13 Wall. 257, 263, per Mr. Justice Bradley. And it has been repeatedly decided, under § 709 of the Revised Statutes, that to give this court jurisdiction of a writ of error to a state court, it must appear affirmatively, not only that a federal question was presented for decision to the highest court of the State having jurisdiction, but that its decision was necessary to the determination of the cause, and that it was actually decided, or that the judgment as rendered could not have been given without deciding it. *Brown* v. *Atwell*, 92 U. S. 327; *Citizens' Bank* v. *Board of Liquidation*, 98 U. S. 140; *Chouteau* v. *Gibson*, 111 U. S. 200; *Adams County* v. *Burlington & Missouri Railroad*, 112 U. S. 123; *Detroit City Railway* v. *Guthard*, 114 U. S. 133; *New Orleans Water Works Co.* v. *Louisiana Sugar Refining Co.*, 125 U. S. 18.

Inasmuch, therefore, as the judgment of the Supreme Court of the State of South Carolina, sought to be brought in review by this writ of error, does not involve any question necessarily arising under the Constitution of the United States, or the laws and treaties made in pursuance thereof, we must refuse to take jurisdiction in the case.

*The writ of error is accordingly dismissed for want of jurisdiction.*